IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL MACREADY, et al.　　　:　　　　CIVIL ACTION
　　　　　　　　　　　　　　　　:
　　　　　　v.　　　　　　　　　:
　　　　　　　　　　　　　　　　:
TCI TRANS COMMODITIES,　　　　:
A.G., et al.　　　　　　　　　:　　　NO. 00-4434

MEMORANDUM

McLaughlin, J.                                October 11, 2011

        This suit arises from a sales contract between the

plaintiff Kennett International Corp. ("Kennett") and TCI Trans

Commodities A.G. ("TCI Switzerland"), a Switzerland-based

corporation that is now bankrupt.  The plaintiff seeks to recover

outstanding debts incurred by TCI Switzerland from the defendant,

a New York-based corporation called Trans Commodities, Inc.

("Trans Commodities").  The plaintiff claims that the two

companies are so intertwined or interrelated that through the

"alter ego," "enterprise entity," or "single entity" theories of

piercing the corporate veil, the plaintiff can reach the assets

of Trans Commodities.

        This case was filed in 2000 but was in suspension for

many years pending bankruptcy proceedings involving TCI

Switzerland and then settlement discussions between the parties.

In November of 2009, the Court permitted discovery and then

dispositive motions on the issue of the defendant's liability

under a veil piercing theory.  The defendant moved for summary

judgment.  The Court will grant the defendant's motion for summary judgment.

I.   Summary Judgment Record

Kennett entered into a sales contract with TCI Switzerland in 1996.  The terms of the agreement are defined by three one-page letters exchanged in early October of 1996 by Michael Macready, the owner of Kennett, and Julian Connor, an employee of TCI Switzerland.  Mem. of Law of Pl. in Opp. to Mot. of Def. ("Pl. Opp."), Decl. of Michael Macready ("Macready Decl."), Ex. A.

Between 1996 and 2000, Kennett acted as a commissioned sales agent for TCI Switzerland.  The plaintiff brought this suit in 2000 for commission payments that were not made. In the original complaint, Macready was named as a plaintiff, and Seymon Kislin ("Sam Kislin" or "Kislin"), David Kislin, Henry Kislin, and Elliot Asher were named as individual defendants.  The complaint was amended two months after filing.  The amended complaint named only Kennett as a plaintiff and only TCI Switzerland and Trans Commodities as defendants.

TCI Switzerland entered bankruptcy proceedings in 2001 and the plaintiff was unable to recover from TCI Switzerland the debts owed.

A.    Trans Commodities

       Trans Commodities was created in 1992 by Kislin
although Kislin had been using the name "Trans Commodities" in
commodities trading work he was doing as early as 1990.  From
1992 until 1997, Kislin was the sole shareholder and CEO of Trans
Commodities.  In 1997, Kislin gave his stock ownership to his two
children, Regina and David Kislin.  Around 2000, David Kislin
became the sole shareholder of Trans Commodities.  During this
time, Kislin remained on Trans Commodities's board of directors
and was the company's CEO.  Mem. of Law in Supp. of Def. Mot. for
Summ. J. Def. Mot. ("Def. Mot."), Decl. in Supp. ("Kislin Decl.")
¶¶ 5-6.

B.    Trans Commodities's Relationship With TCI Switzerland[1]

       TCI Switzerland was created in 1993 by Ansgar Felber.
When founding TCI Switzerland, Felber worked with Kislin, who had
contacts with Russian metal suppliers.  In exchange for contact
with these suppliers, Felber offered Kislin guaranteed purchasing
levels from those companies as well as the opportunity to choose
members of the TCI Switzerland Board of Directors.  Both David
Kislin and George Benninger, Kislin's attorney, were on the board
of directors of TCI Switzerland from its formation until it

_____

       [1]    The parties dispute the nature of the relationship
between TCI Switzerland and Trans Commodities.  For the purpose
of this summary judgment motion, the evidence is read in a light
most favorable to the non-moving party, Kennett.

3

entered bankruptcy.  In 1998, Ansgar left TCI Switzerland.  Willi Bolinger took over as CEO and Connor took control of sales and purchasing for TCI Switzerland.  Kislin was never an employee or a director of TCI Switzerland.  Kislin Decl. ¶¶ 5, 10, 12, 16-18, 25.

Trans Commodities entered into a Consulting Agreement with TCI Switzerland in 1995.  Trans Commodities provided logistical support to TCI Switzerland, particularly regarding the collection of unpaid debts from customers in the United States. Kislin Decl. ¶¶ 13-14.

Trans Commodities's interaction with TCI Switzerland extended beyond mere support.  E-mails from David Kislin to Connor in early 1999 show that Kislin authorized hiring and firing of some TCI Switzerland employees.  In addition, Connor spoke with Kislin every day, sometimes multiple times a day, about TCI Switzerland's trades, shipments, profits, and other matters.  Pl. Opp., Decl. of Julian H. Connor ("Connor Decl.") ¶¶ 7, 19, Ex. JCH 2 a-b.  Connor believes that Trans Commodities had "absolute control" over the hiring, firing, and steel trade determinations of TCI Switzerland and that steel contracts were only made by TCI Switzerland after they were sent to Trans Commodities for approval by Kislin.  In 1997, Connor was informed by Kislin that Trans Commodities would "take over direct control

of the claims and rejections process" for TCI Switzerland. Connor Decl. ¶¶ 4, 6, 13.

While executing Kennett's contract with TCI Switzerland, Macready spoke daily with Sam or David Kislin or Elliot Asher, a Trans Commodities employee.  On two letters to Macready, Asher lists Trans Commodities below his signature line, and the address is listed in New York, but the letterhead is that of TCI Switzerland.  Another letter to Macready likewise lists the employee as that of Trans Commodities but is on TCI Switzerland letterhead.  Macready Decl., Exs. B, C-1 to C-3, C-5.

In late 2000, Trans Commodities withdrew approximately one million dollars belonging to TCI Switzerland from a lockbox in a Manhattan bank.  This money was eventually returned by Trans Commodities to TCI Switzerland.  See Pl. Opp., Ex. F David Kislin Dep. 124-125; Macready Decl., Exs. E-5, E-6, E-8.[2]

C.   Kislin's Relationship with TCI Switzerland

Separately from Trans Commodities, Kislin personally had a relationship with TCI Switzerland.  Kislin provided advice to Ansgar regarding purchase pricing and market trends and continued to advise Bolinger and Connor after Ansgar left.

---

[2]    The defendant contends that it properly had authority over the money, which it secured because of financial irregularities with TCI Switzerland.  David Kislin Dep. 123-24. The plaintiff argues that Trans Commodities did not have a right to hold the money.  See Macready Decl., Ex. E-5.

Kislin Decl. ¶¶ 12, 16, 26. Kislin also attended TCI Switzerland Board Meetings, as an "Informal Member" of the Board. See Macready Decl., Ex. E-11.

Kislin may also have been the owner of Tanacross B.V. ("Tanacross"), which owned TCI Switzerland. Minutes from a TCI Switzerland board meeting list Kislin as the owner of Tanacross and a power of attorney document directing Tanacross is signed by Kislin. Connor Decl. ¶ 5; Macready Decl., Exs. E-4, E-12. In a declaration submitted in a different lawsuit, Kislin states that Trans Commodities had a branch office in Switzerland, although he does not refer to TCI Switzerland directly. See Pl. Opp., Ex. A Kislin EFC Decl. ¶ 7.[3]

In addition, other Kislin-owned companies interacted with TCI Switzerland. These companies include Trans Commodities Food AG ("TCI Food") and Redy Corp. Several documents from the files of TCI Switzerland demonstrate movement of funds between TCI Switzerland and TCI Food and Redy Corp. See Macready Decl. Exs. E-10, E-11, E-13.

Notably, neither Kislin nor other Kislin owned companies are defendants in this action, nor is the plaintiff attempting to reach Kislin's personal assets. The extent of

---

[3]    The parties dispute this fact. Kislin claims no knowledge of the ownership of Tanacross. Kislin Decl. ¶ 12. The Court concludes that the plaintiff has raised a triable issue on the question of Tanacross's ownership.

Kislin's personal control over TCI Switzerland and TCI Switzerland's interaction with other Kislin companies is only material to the plaintiff's effort to pierce the corporate veil to the extent that this evidence could cause a reasonable jury to conclude that TCI Switzerland and Trans Commodities were intertwined.

II.  Analysis[4]

The parties dispute the law applicable to the question of piercing the corporate veil.  The plaintiff argues that New York law should apply to this issue, while the defendant argues in favor of Pennsylvania law.

A federal court sitting in a diversity action applies the choice-of-law analysis of the forum state in which it sits,

---

[4]   A party is entitled to summary judgment if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, which may be satisfied by demonstrating the party who bears the burden of proof lacks evidence to support his case.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A fact is "material" if it might affect the outcome of the suit under the governing law and "genuine" if a reasonable jury could find for the nonmoving party based on the evidence presented on that issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In making its determination, the court must consider the evidence in a light most favorable to the nonmoving party.  Sheridan v. NGK Metals Corp., 609 F.3d 239, 251 n.12 (3d Cir. 2010).  Once a properly supported motion for summary judgment is made, the burden of production then shifts to the nonmoving party, who must set forth specific facts showing that there is a genuine issue for trial. Liberty Lobby, Inc., 477 U.S. at 250.

in this case, Pennsylvania.  Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941); Hammersmith v. TIG Ins. Co., 480 F.3d 220, 226 (3d Cir. 2007).  When Pennsylvania courts consider issues of corporate law, the first step is usually an application of the Internal Affairs Doctrine, codified at 15 Pa. Cons. Stat. § 4145. See, e.g., Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 179 (3d Cir. 2005); Guinan v. A.I. DuPont Hosp. for Children, 597 F. Supp. 2d 485 (E.D. Pa. 2009).  The parties agree that the Internal Affairs Doctrine does not apply in this case and does not govern the Court's choice of law determination.

Therefore the Court moves to Pennsylvania's general choice-of-law analysis to determine what law should apply.

A.   Choice of Law

When there is no explicit or implicit choice of law among the parties, as is the case here, Pennsylvania choice-of-law determinations proceed in three steps.  First, the court must consider the laws of the relevant forum states in order to determine "if there is an actual or real conflict between the potentially applicable laws."  Hammersmith, 480 F.3d at 230.  As a threshold matter, the court "must determine whether these states would actually treat this issue any differently."  Air Prods. & Chems., Inc., v. Eaton Metal Prods. Co., 272 F. Supp. 2d 482, 490 n.9 (E.D. Pa. 2003).

If a comparison shows "there are relevant differences between the laws," then the court moves to the second step: examining "the relevant policies underlying each law, and classify[ing] the conflict as a 'true,' 'false,' or an 'unprovided-for' situation." Hammersmith, 480 F.3d at 230.  If application of either state's law would not implicate the interests of the other state, there is a "false" conflict, and the court should apply the law of the interested forum.  On the other hand, if the laws of either state would be impaired by the application of the other's law, a "true" conflict exists.  An "unprovided-for" situation occurs where neither state's interests are implicated in the dispute.  Id. at 230 n.9.

If there is a "true" conflict, the court moves to the last step.  The court must determine "which state has the greater interest in the application of its law."  Id. at 231 (internal quotations omitted).  Courts should consider the factors in the Restatement (Second) of Conflict of Laws as well as a "qualitative appraisal" of the interested states' policies.  Id. at 231-33.

B.   The Law of New York

While New York courts "disregard corporate form reluctantly," New York law has long recognized piercing the corporate veil when two corporations operate as a "single entity" (also referred to as the "alter ego" or "agent" theory).  Wang

9

Labs. v. Dataword Corp., 680 F. Supp. 110, 111 (S.D.N.Y. 1998);
see also William Wrigley Jr. Co. v. Waters, 890 F.2d 594, 600-02
(2d Cir. 1989); Walkovszky v. Carlton, 18 N.Y.2d 414, 418 (N.Y.
1966) (recognizing piercing the veil on the theory that "a
corporation is a fragment of a larger corporate combine").

    1.   New York's Veil-Piercing Test

       In New York, there is a generally recognized two-part
test in order to pierce the corporate veil on any theory.  The
plaintiff must show "(1) complete domination of the corporation
in respect to the transaction attacked; and (2) that such
domination was used to commit a fraud or wrong against the
plaintiff which resulted in plaintiff's injury."  Morris v. N.Y.
State Dep't of Taxation & Fin., 82 N.Y.2d 135, 141-42 (N.Y.
1993); see MAG Portfolio Consultant, GMBH v. Merlin Biomed Group
LLC, 268 F.3d 58, 64 (2d Cir. 2001)(citing and applying this two-
part test); E. Hampton Union Free Sch. Dist. v. Sandpebble
Builders, Inc., 884 N.Y.S.2d 94, 98-99 (N.Y. App. Div. 2009)
(same).

       The New York Court of Appeals explicitly held that
"[w]hile complete domination of the corporation is the key to
piercing the corporate veil . . . standing alone, [it] is not
enough."  There must also be a showing of "a wrongful or unjust
act toward plaintiff."  A plaintiff "seeking to pierce the
corporate veil must establish that the owners, through their

domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party." Morris, 83 N.Y.2d at 142-43.   Although the Morris standard requires this close connection between the defendant's fraud and the harm alleged by the plaintiff, the test does not require that the defendant acted with the specific intent to harm the plaintiff. Id. at 143.

One of the most instructive cases on the application of New York law to a claim of single-entity veil piercing is Passalaqua, a decision by the Court of Appeals for the Second Circuit.[5] Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 138-41 (2d Cir. 1991).   The court considered whether the plaintiff could pierce the corporate veil of a defendant corporation which was one of many corporations owned and operated by the Resnik family.   The court considered ten factors, in addition to the totality of the circumstances, in determining corporate domination of the corporation by the others.   These factors included (1) the absence of corporate formalities, (2) inadequate capitalization, (3) whether corporate funds were used for personal rather than corporate uses, (4)

---

[5]      The Passalaqua court, writing two years before the New York Appeals Court in Morris, held that the plaintiff could prevail upon a showing of either domination or fraud.   Because Morris clearly requires both elements to be proven, the Court does not rely upon this holding of Passalaqua.   The court's analysis of the facts remains persuasive.

overlap in ownership, officers, directors, and personnel of the corporations, (5) common office space, (6) the business discretion afforded to each corporation, (7) whether the corporations dealt with one another at arms length, (8) whether the corporations were treated as independent profit centers, (9) the payment or guarantee of debts of one corporation for another, and (10) the use of property of one corporation by another.

The plaintiff provided evidence of financial records, bank accounts, tax returns, board meetings, employee compensation, and contracts between the corporations.  Based on this evidence, the court concluded that a reasonable jury could find sufficient domination of the corporation by the Resnick family and corporations to justify piercing the corporate veil. Id. at 139-40.

### 2.   Applying New York Law to This Case

The Court first considers the issue of domination.  The plaintiff must show that Trans Commodities dominated TCI Switzerland.  The Court starts with the factors listed by the Passalaqua court.  Despite relying exclusively upon Passalaqua in its summary judgment motion, the plaintiff has not addressed many of these factors.  The record contains no evidence about the corporate formalities or capitalization of either TCI Switzerland or Trans Commodities.  There is no evidence alleging personal use of either companies' corporate funds.  The two companies did not

12

share common office space.  The only evidence addressing the
contractual relationships between the two corporations is the
consulting agreement the parties entered into in 1995 which
itself provides little detail of the nature of the relationship.
The plaintiff does not present evidence on the treatment of the
profits and debts of each corporation or the use of property of
one corporation by the other.

The plaintiff has presented evidence on two of the
factors: overlap of ownership and directors and the business
discretion of each corporation.  David Kislin was an owner of
Trans Commodities and a director of TCI Switzerland.  There is
also a genuine issue of material fact on whether Kislin owned TCI
Switzerland through Tanacross.  In addition, evidence suggests
that Trans Commodities directed some TCI Switzerland business
decisions, including hiring, firing, and purchase choices.

The plaintiff has presented evidence of a close
relationship between TCI Switzerland and TCI Food and Redy Corp.
However, these corporations are not defendants in this suit, nor
is there evidence of the relationship between these corporations
and Trans Commodities.  These documents do not raise a triable
issue of domination of TCI Switzerland by the defendant in this
case, Trans Commodities.

Given the limited evidence presented by the plaintiff,
no reasonable jury, considering the totality of the

circumstances, including the <u>Passalaqua</u> factors, could conclude that Trans Commodities dominated the corporate affairs of TCI Switzerland.

Equally as important, the plaintiff has not adduced evidence that Trans Commodities's alleged domination of TCI Switzerland was used to commit fraud "against the plaintiff which resulted in plaintiff's injury." <u>Morris</u>, 82 N.Y.2d at 141-42. The plaintiff offers no evidence of a connection between Trans Commodities's interactions with TCI Switzerland and the latter's inability or refusal to pay the plaintiff.[6] Even if the plaintiff could show complete domination of TCI Switzerland by Trans Commodities, the plaintiff has not alleged that Trans Commodities "through [its] domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice" against the plaintiff. <u>Morris</u>, 83 N.Y.2d at 142-43.

---

[6] The plaintiff contends that the Kislin family unlawfully siphoned millions of dollars out of TCI Switzerland and into a corporation located in Dublin, Ireland. Connor makes this assertion without any explanation of his basis of knowledge of the Dublin corporation. Connor Decl. ¶¶ 10-11. Evidence considered at summary judgment must be admissible or capable of being reduced to admissible evidence. Fed. R. Civ. P. 56(c)(1)(A). Even if the Court were to accept this allegation as admissible and true, it does not raise a triable issue of fact that Trans Commodities committed wrongdoing. None of the Kislins are defendants in this suit, nor is any Irish corporation.

14

C.   Pennsylvania Law

As in New York, "there is a strong presumption in Pennsylvania against piercing the corporate veil." Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995).  When considering Pennsylvania law, the Court of appeals for the Third Circuit directs "any court [to] start from the general rule that the corporate entity, should be recognized and upheld, unless specific, unusual circumstances call for an exception." Zubik v. Zubik, 384 F.2d 267, 273 (3d Cir. 1967).  Pennsylvania has rejected attempts to disregard the corporate form "outside traditional attempts to impose liability on shareholders."  A survey by the Court of Appeals found, for example, that the Pennsylvania Supreme Court has frequently refused to disregard the corporate form between parent and subsidiary corporations. See Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 353 (3d Cir. 2001) (collecting cases).

Notably, "there is no definitive test for piercing the corporate veil" in Pennsylvania.  First Realvest Inc. v. Avery Builders, Inc., 600 A.2d 601, 604 (Pa. Super. Ct. 1991); Kellytown Co. v. Williams, 426 A.2d 663, 668 (Pa. Super. Ct. 1981).  Instead, using a flexible approach, "Pennsylvania law requires consideration of the totality of the circumstances in order to determine whether the corporate veil should be pierced."

15

Castle Cheese, Inc. v. MS Produce, Inc., No. 04-878, 2008 WL
4372856, at *32 (W.D. Pa. Sept. 19, 2008).

As a general matter, "the corporate form 'will be
disregarded only when the entity is used to defeat public
convenience, justify wrong, protect fraud or defend crime.'"
First Realvest, 600 A.2d at 601 (quoting Sams v. Redevelopment
Auth., 244 A.2d 779, 781 (Pa. 1968)).  A court can disregard a
corporate entity without a specific showing of "fraud, illegality
or wrongdoing" so long as "it is necessary to avoid injustice."
Rinck v. Rinck, 526 A.2d 1221, 1223 (Pa. Super. Ct. 1987).

1.   The Single Entity Theory in Pennsylvania

Pennsylvania treats classic veil piercing, which occurs
"where the individual or corporate owner controls the corporation
to be pierced and the controlling owner is to be held liable"
differently from the "quite distinct" claim for "single entity"
or "enterprise entity" liability.  Under the single entity
theory, "two or more corporations share common ownership and are,
in reality, operating as a corporate combine."  Miners, Inc. v.
Alpine Equip. Corp., 722 A.2d 691, 694-95 (Pa. Super. Ct. 1998).

The Miners court is the highest court in Pennsylvania
to consider the single entity theory.  While noting that this
"theory . . . has yet to be adopted in Pennsylvania," the court
nonetheless determined that the plaintiff did not allege
sufficient facts to pierce the corporate veil under this theory.

16

See id. at 695; see also Advanced Tel. Sys. v. Com-Net Prof'l
Mobile Radio, LLC, 846 A.2d 1264, 1278 n.9  (Pa. Super. Ct. 2004)
(acknowledging this holding of Miners as good law).

Following Miners, courts applying Pennsylvania law have
been split on whether to consider single entity theory claims.
Some courts have held that because the Pennsylvania Supreme Court
has not recognized the single entity theory, it is not an avenue
of liability available to plaintiffs.  See, e.g., Bouriez v.
Carnegie Mellon Univ., No. 02-2104, 2005 WL 3006831, at *19-*20
(W.D. Pa. Aug. 6, 2008); E-Time System, Inc. v. Voicestream
Wireless Corp., No. 01-5754, 2002 WL 1917697, at *12 (E.D. Pa.
Aug. 19, 2002).  Other courts have held that because the
Pennsylvania Supreme Court has not explicitly foreclosed the use
of the single entity theory, the theory can be pursued by
plaintiffs.  See, e.g., Gupta v. Sears, Roebuck and Co., No. 07-
243, 2009 WL 890585, at *2 (W.D. Pa. Mar. 26, 2009); Ziegler v.
Del. Cnty. Daily Times, 128 F. Supp. 2d. 790, 794-96 (E.D. Pa.
2001).[7]  Still other courts have applied a single entity theory

_____

[7]    In both Gupta and Zeigler, the courts refer to the
"single entity" and "integrated enterprise" theory as alternate
tests.  See Gupta, 2009 WL 890585, at *2; Ziegler, 128 F. Supp.
2d at 796 n.18.  The integrated enterprise theory, however, is
not Pennsylvania state law.  The theory was developed by the
Court of Appeals two years before Miners to determining the
liability of a parent corporation for its subsidiary's actions in
the context of an employment discrimination suit under New Jersey
law.  Marzano v. Computer Sci. Corp., 91 F.3d 497 (3d Cir. 1996);
Delacruz v. Piccari Press, 521 F. Supp. 2d 424, 429-30 (E.D. Pa.
2007).  The integrated enterprise tests is applicable to labor

without discussing the <u>Miners</u> decision.  <u>See Castle Cheese, Inc.</u> <u>v. MS Produce, Inc.</u>, No. 04-878, 2008 WL 4372856, at *32 (W.D. Pa. Sept. 19, 2008) (applying a "single entity" claim in which the plaintiff showed that "in all aspects of their business, the two corporations actually functioned as a single entity and should be treated as such").  Research reveals no court, however, applying Pennsylvania law which has found in favor of a plaintiff on a single entity claim.

In one case, a federal court considered whether the Pennsylvania Supreme Court would adopt the single entity theory if squarely presented with the issue.  In <u>Schwab</u>, the trustee of a bankrupt limited liability company sought to reach the assets of a separate company owned by the same two principals as the LLC.  <u>Schwab v. McDonald (In re LmcD, LLC)</u>, 405 B.R. 555, 564-65 (Bankr. M.D. Pa. 2009).  The court considered other state court rulings, the conservative approach Pennsylvania courts take regarding piercing the corporate veil, and that Pennsylvania courts have allowed veil piercing in some cases.  The court concluded that "the Pennsylvania Supreme Court would likely adopt the 'single entity theory' . . . to prevent fraud or injustice." <u>Id.</u>

---

law and is distinct from the veil-piercing test at issue in this case.  <u>See Pearson v. Component Tech. Corp.</u>, 247 F.3d 471, 486 (3d Cir. 2001); <u>Bouriez</u>, 2005 WL 3006831, at *19.

2.   Applying Pennsylvania Law to This Case

This Court will consider the single entity theory described in Miners but does not need to determine whether the Pennsylvania Supreme Court would adopt this theory.  The relevant factors described by the Miners court are "[1] identity of ownership, [2] unified administrative control, [3] similar or supplementary business functions, [4] involuntary creditors, and [5] insolvency of the corporation against which the claim lies." Miners, 722 A.2d at 695.  See also Schwab, 405 B.R. at 564-65 (considering these factors).

The Court begins with the first factor, unified ownership.  Kislin was the sole shareholder of Trans Commodities between 1992 and 1997.  Kislin may also have been the owner of Tanacross, and thus the owner of TCI Switzerland.  Plaintiff has raised a disputed issue of fact regarding common ownership of the two corporations.

There is also evidence of the second factor, unified administrative control.  Trans Commodities and TCI Switzerland were located in different countries and had different employees. Trans Commodities employees, however, occasionally acted on behalf of TCI Switzerland and used TCI Switzerland letterhead to do so.

19

The third and fifth factors are not in dispute.  Both companies engaged in commodities trading and TCI Switzerland is insolvent and unable to meet its debts.

The plaintiff, however, does not present evidence sufficient to satisfy the fourth factor, that of involuntary creditor status.  An involuntary creditor is one "who did not rely on anything when becoming [a] creditor[]," for example, a tort victim.  Schwab, 405 B.R. at 566.  The plaintiff voluntarily entered into a sales commission relationship with the defendant.  The plaintiff could have inspected the financial structure of TCI Switzerland and discovered potential risks before entering the relationship.  In addition, Macready regularly communicated with employees of Trans Commodities, including Sam and David Kislin and Asher.  But Kennett did not seek to alter its contract to include Trans Commodities or the individual Kislins as obligors.

Pennsylvania courts do pierce the corporate veil to prevent fraud or avoid injustice.  As discussed above, the plaintiff has not presented evidence which, even read in a light most favorable to it, raises a triable issue of fact on fraud or wrongdoing perpetrated by Trans Commodities.

Because the plaintiff is a voluntary creditor who appears to have significant knowledge about the company he contracted with, even if this Court were to find that the Pennsylvania would adopt the "single entity" theory and apply the

20

test laid out in Miners, the Court concludes that no reasonable jury could find that the plaintiff is entitled to pierce the corporate veil of TCI Switzerland under Pennsylvania law.

    D.   There is No Conflict of Laws

    The Court concludes that as applied to this case, there is no relevant difference between New York and Pennsylvania law. Although the tests Pennsylvania and New York use to determine if a corporate veil can be pierced on the single entity theory differ, under either state's law, the plaintiff has not adduced sufficient evidence to raise a triable issue of fact.  The Court does not need to move to the "deeper choice-of-law analysis." Hammersmith, 480 F.3d at 230.  Under either state's law, the defendant is entitled to summary judgment.

    An appropriate order shall issue.